THE STATE, THE MAYOR, &c., OF JERSEY CITY, PROSE-
CUTOR, v. THE NATIONAL DOCKS RAILWAY COMPANY.

THE STATE, THE NATIONAL DOCKS RAILWAY COMPANY
ET AL., PROSECUTORS, v. THE MAYOR, &c., OF JERSEY
CITY.

1. The statute which confers upon railroad companies power to obtain by
condemnation lands necessary for the construction and use of their
works, has expressly made the inability of the company to obtain such
lands by agreement with the owner the condition on which the power
may be exercised.

2. Inability to agree with the owner for the use or purchase being made
a jurisdictional fact necessary to legalize condemnation proceedings,
the company cannot resort to such proceedings to avoid the obligation
of the contract by which it obtained possession of the lands.

3. The board of street and water commissioners of Jersey City may by
resolution dedicate lands owned by the city for use as a public street.
But that body cannot open a street by resolution or in any other way
than by the intervention of commissioners and the procedure thereon
prescribed by the city charter.

On *certiorari* to review an order appointing commissioners
in condemnation proceedings.

On *certiorari* to review resolutions of the street and water
commissioners of Jersey City in relation to opening a street
over Brown place sewer.

Argued at November Term, 1892, before Justices DEPUE
and WERTS.

For the city, *William D. Edwards, City Counsel.*

For the railway company, *Dickinson, Thompson & Mc-
Master* and *Collins & Corbin.*

The opinion of the court was delivered by

DEPUE, J.   Jersey City acquired title in fee to a strip of
land fifty feet in width by a deed from Albert N. Brown,

dated December 12th, 1885, for the consideration of $12,-106.80. This conveyance was the outcome of proceedings under the city charter to condemn lands for the construction of a sewer known as the Brown place sewer, which extended from Avenue E to the exterior line of filling in the tidewater of New York bay. The title conveyed by Brown for such parts of the land as he owned was in fee, without qualification or restriction.

On the 21st of November, 1891, the National Docks Railway Company having filed a location of its route over and across the strip of land conveyed by Brown to the city, presented a written petition to the board of street and water commissioners for leave to construct its tracks across the Brown place sewer, offering and agreeing, in case the application is granted, "to construct for the support of their tracks and to maintain bridges or arches over the sewer, having an elevation of not less than eleven (11) feet in the clear above the crown of the sewer resting upon stone abutments and foundations constructed on each side of the sewer twenty (20) feet apart,   *   *   *   and in case a street shall hereafter be opened, upon said strip of fifty feet in width, owned by the city, under said railroad, then the company agrees, when requested by the city authorities, to move back said abutments to the side lines of the street, and to construct their railroad across said strip, in accordance with law, in such a manner as to leave a clearance of at least twelve (12) feet above the top of said sewer."

On the 3d of December, 1891, the board of street and water commissioners adopted a resolution which, after reciting the said application, is in these words:

"*Resolved,* That the said application be granted upon the plans and terms offered and agreed to by the company, which are hereby accepted and approved, provided, however, that in case a street shall hereafter be opened upon said strip of fifty feet owned by the city under said railroad, then said company shall, when requested by the city authorities, move back said abutments to the side lines of the street and construct their

railroad across said strip in accordance with law, and in such a manner as to leave a clearance of at least twelve feet above the top of said sewer."

On the 7th of December, 1891, Henry Lembeck, A. N. Brown and one hundred others, taxpayers and residents of that portion of Jersey City formerly known as Greenville, presented a petition to the board requesting that the strip of land be declared to be a public street. On the 14th of April, 1892, the board passed a resolution in accordance with the said petition. This resolution was vetoed by the mayor on the 21st of April, 1892, on the ground that there was then no present need of a public street over the premises.

On the 19th of September, 1892, the railway company presented a petition to the board for a grant of a right of way over the strip on the plan proposed in their application of November 21st, 1891, omitting that part of it which related to the company's undertaking to provide a clearance of twelve feet above the top of the sewer, and to remove their abutments to the side lines of the street in case a street should thereafter be opened on said strip, with an offer to the city of the sum of $500 for said grant. On the 28th of September, 1892, the board of streets and water commissioners again took up the Lembeck petition and adopted a series of resolutions, one of which declared the strip in question to be a public street. In the forenoon of that day, and before these resolutions were passed, the railway company served on the mayor a notice of an application for the appointment of commissioners to condemn the right of crossing over this strip of land. The description of the premises sought to be acquired by the condemnation proceedings contained in the petition for the appointment of commissioners, is in these words : "The interest and estate which your petitioner desires to condemn in so much of said lands as are used for a public sewer is a right to cross the same by an elevated structure upon which your petitioner's tracks shall be laid, which structure shall be at least eleven feet high in the clear above the crown of the sewer, and shall rest upon stone abutments placed on each

side of the said sewer, at a distance not less than ten feet on either side from the centre line of said sewer, and so as not to interfere in any manner with the sewer, nor the use, repair or maintenance thereof." The description in the petition is in effect the same as was contained in the company's first application to the board, with the exception of that part of the latter which related to the opening of a street over the premises. The result sought to be accomplished by the condemnation is the extinguishment of that part of the company's agreement with the city which concerned its works in case a street was opened.

These proceedings have given rise to two writs of *certiorari*—the one in behalf of the city to review the order appointing commissioners to condemn, the other by the railway company to review the resolutions of the board of the 28th of September, 1892.

The *certiorari* presented by the city to review the appointment of commissioners in the condemnation proceedings will first be considered.

The General Railroad law, under which this company was organized, authorizes the condemnation of lands required for railroad purposes only in case the company cannot agree with the owner for the use or purchase thereof, or when by the legal incapacity or absence of such owner no such agreement can be made. *Rev., p.* 928, § 100. The power of condemnation under the right of eminent domain is strictly construed, and is subject to the conditions and restrictions imposed by the legislative grant. The proposition of the railway company to the board of street and water commissioners, November 21st, 1891, and the acceptance of the proposition by the board by the resolution of the 3d of December, 1891, was an agreement for the use of these lands for a crossing. This agreement was made by the company with full knowledge that the city contemplated the use of this strip for a street, and that a clearance of twelve feet above the sewer was required for that purpose. Mr. Dickinson, who represented the company in the negotiations with the city, testified that the city

counsel drew the proviso to the resolution which had been prepared by the company's counsel, and that he incorporated the resolution with the proviso in the company's application to the board of street and water commissioners, and after the resolution of the board was passed he sent a copy of it to the president of the company. And the witness adds, " the bridge was built accordingly." The so-called engineering difficulties were as apparent at the time the agreement was accepted and acted upon by the company as at the later period. Nevertheless the company took possession and proceeded to erect its bridge under the agreement. The brief submitted by the company's counsel on this argument concedes that the company acted in this transaction with full knowledge. The language of the brief is as follows : " It was our reasonable expectation when the licenses were asked for and granted that here as elsewhere no street would be opened by the city until there should be use for it ; in our judgment this will not be for many years and we were willing to take the risk." The complaint is, that the board, as soon as the company had expended $10,000 to $15,000, was induced by a " senseless clamor " to take measures looking towards the appropriation of this strip to public use for a street.

Nor are the rights of the public in this controversy to be overlooked. The sewer constructed through the premises is only five feet in width. A strip fifty feet wide was acquired obviously with a view to its use for a public street. The cost of this strip of land to the city was over $12,000, and three-fourths of the entire expense of the improvement was assessed for benefits by an assessment upon the owners of lands over a large section. That such a street is or may be required for public accommodation is apparent from the application to the city authorities that it be made a street, signed by over one hundred taxpayers and residents in the locality for which the street would afford an outlet. Among these applicants are the owners of lands which were assessed for the improvement. For the injury sustained by the public and by private owners by obliterating a public thoroughfare

the law affords no method of compensation in damages to be awarded in the condemnation proceedings.

The legislature, in conferring upon railway companies the power to obtain by condemnation lands required for the construction and use of their works, has expressly made the inability of the company to obtain such lands by an agreement with the owner the condition on which the power may be exercised. Inability to agree with the owner for the use or purchase of such lands is made a jurisdictional fact necessary to legalize condemnation proceedings. A company having acquired such lands as at the time seemed sufficient for its purposes, may acquire additional lands by condemnation when additional accommodations may become necessary to enable the company to exercise its franchises. A company in the use of premises for railroad purposes under a lease for an unexpired term may, under its charter power, take the same premises in fee by condemnation when the leasehold estate is so limited in its continuance and is so qualified in its character as not to subserve the needs of the company in the scheme of improvement authorized by its charter. *De Camp* v. *Hibernia R. R. Co.*, 18 *Vroom* 43. But no contingency of an analogous import has arisen in this case. The survey and location of the company's road on which it is being constructed was adopted prior to the making of this agreement. The plan adopted in the agreement affords reasonable means to enable the company to effect a crossing over a public street, and is such as is necessary to accommodate the public in the use of the contemplated street. A crossing on that plan may require an increased expense, and may subject the company to some inconvenience in the increased grade of its road, but nothing appears that would justify the inference that the cost of construction would be greatly advanced, or that the crossing contracted for would occasion any serious embarrassment in operating the company's railroad. The case discloses nothing that would justify the company in withdrawing from its agreement and resorting to condemnation proceedings to avoid its own contract. And unless we adopt the construction that

the limitation contained in the statute authorizing condemnation proceedings by these companies is a mere formality, to be set aside and disregarded at the caprice or in the interest of these companies, whenever they see fit to withdraw from their agreements, this proceeding cannot be made to square with the legislative restriction imposed by the statute upon the exercise of the right of eminent domain by these companies. This construction we are unwilling to adopt. The order appointing commissioners should be set aside.

The other writ of *certiorari* presented by the National Docks Railway Company against Jersey City brings up for review the resolutions of the board of street and water commissioners which were passed on the 28th of September, 1892. The first of these resolutions declared that the strip of land in question, through which the Brown place sewer had been constructed, shall be a public street. This resolution is simply an act of dedication to public uses by the city of the strip in question. The city, as the owner of lands acquired as these lands were, had power to appropriate them to such a use. This resolution has no other office or effect than to dedicate lands within the route of the street which were owned by the city, and to that extent is unobjectionable. The second resolution instructed the chief engineer to prepare a grade map for a public street, " to the end that the same may be graded and improved." The fourth resolution directed the law officers of the city " to take such measures in the name of the city as will secure Brown place as an unincumbered street from Avenue E to the easterly boundary line of New York bay." These two resolutions, the second and fourth in order, were instructions by the city authorities to its officers with respect to the performance of duties with which those officials were charged. There is nothing in those two resolutions that indicates anything illegal in the action of the board. The first, second and fourth of these resolutions are sustained.

The third resolution is in these words :

"*Resolved*, That the Lehigh Valley Terminal Railway Company and the National Docks Railway Company be notified

to forthwith remove all abutments and obstructions placed by them within the line of said street, and that the superintendent of streets and roads be charged with the duty of enforcing this order."

This resolution directs an act of execution which would be legal only in the event of the place in question having become a public street in compliance with the city charter. The companies named in this resolution are the prosecutors of this writ.

The opening of a street in Jersey City can be effected only by the intervention of commissioners appointed in the manner prescribed by the city charter. *Pamph L.* 1871, *pp.* 1113, 1114.

Every street " opened " in the city involves (1) the acquisition of the necessary lands, (2) the obligation of the city to improve, maintain and keep in repair the streets of the city, and (3) the assessment for benefits. Section 41 of the charter prescribes the manner in which a street shall be " opened," and declares that a street shall be opened in that manner and not otherwise. The duties of the commissioners in effecting a street opening are set out in the opinion of this court in *Vreeland* v. *Jersey City*, 25 *Vroom* 49. It is sufficient for present purposes to say that, in addition to the appraisement of the value of lands taken, the commissioners are required to estimate and report " all other expenses likely in their judgment to attend the completion of the improvement," and to ascertain and report the names of the owners of property to be benefited by the improvement; and upon their report of their appraisements, estimates, determination and assessments, a hearing is had ; and if the owners of two-thirds of the property to be assessed for the improvement shall remonstrate against the same being made, the board is prohibited from making the improvement. If the lands required for a street be dedicated by the city or private owners, the assessment of the value thereof would be merely nominal, but the other duties of the commissioners which have been above mentioned remain to be performed, to the end that the owners of prop-

erty to be assessed for benefits may have the privilege of in-terdicting the improvement, and the consequent outlay of money in executing it, by remonstrance. This provision of the city charter was designed, I think, to protect the city treasury from schemes of private speculation promoted by the dedication of streets to be improved at public expense for the advancement of private interests. The language of the section, that streets shall be opened in the manner provided for in that section and not otherwise, seems to be decisive on the subject. The forty-first section of the charter was intended to give to those who might be called upon to defray the expense of public improvements a control over the action of the city officials.

In this case the city is not the owner in fee of all the lands throughout the entire length of the proposed street. In the lands owned by the Morris canal and Central railroad companies the city has only an easement for sewer pipes. In opening the street pursuant to the city charter, proceedings to condemn these lands for the purpose of a street will be necessary, which will involve the cost of the lands and expenses to be assessed upon the lands benefited by the improvement. The owners of lands liable to such assessments are entitled by the charter to arrest the improvement if a sufficient proportion of owners remonstrate against it. This privilege which the charter confers upon those who may have to bear the expenses of the improvement can be secured only by exacting from the city a strict compliance with the provisions of its charter.

Neither under the city charter nor in compliance with the terms of the agreement with the railway company was it competent for the board of street and water commissioners by a resolution to make the *locus in quo* a public street and impose upon the city or upon the owners of lands liable to assessment the expenses incident to construction, maintenance and reparation.

The third resolution should be set aside.